UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:14-cr-20030-JAL

UNITED STATES OF AMERICA,
    Plaintiffs.

SOLOMAN ALKAHDI,
    Defendant.
_____/

DEFENDANT'S SENTENCING MEMORANDUM

    Defendant, through counsel, respectfully submits this sentencing memorandum in connection with his sentencing by the Court on July 8, 2014. On April 4, 2014, Mr. Soloman Alkahdi, (Hereinafter Soloman) pled guilty before this Honorable Court to a single count of false statement in violation of 18 USC § 1001. Soloman accepts full responsibility for his actions, and through this memorandum seeks to provide the Court with information pertinent to his sentencing under 18 USC § 3553.

PRETRIAL AGREEMENT

    In accordance with his pretrial agreement, Soloman joins the government in recommending a sense of 60 months confinement.

SENTENCING ANALYSIS

    Under *United States v. Booker*, 543 U.S. 220 (2005), the Court is directed to impose a sentence under 18 U.S.C. § 3553(a). The Court is to impose a sentence "sufficient, *but not greater than necessary*" to comply with the purposes of punishment in 18 USC § 3553(a)(2). *Id.* (emphasis added); see, e.g., *Kimbrough v. United States*, 552 U.S. 85, 111 (2007) ("sufficient, but not greater than necessary" requirement is the "overarching instruction" of § 3553(a)). Those purposes include "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 USC § 3553(a)(2)(A); "to afford adequate deterrence to criminal conduct," *Id.* § 3553(a)(2)(B); "to protect the public from further crimes of the defendant," *Id.* 3553(a)(2)(C); and "to provide the defendant with needed educational or vocational training, medical care, or other

1

correctional treatment in the most effective manner." *Id.* § 3553(a)(2)(D).

In determining a sentence "sufficient, but not greater than necessary" to accomplish these purposes, courts must consider several factors, including (as relevant here) "the nature and circumstances of the offense and the history and characteristics of the defendant," *Id.* § 3553(a)(1); the guidelines sentencing range and any applicable Sentencing Commission policy statements, *Id.* § 3553(a)(4), (5); and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *Id.* § 3553(a)(6).

Based on the above criteria the defendant respectfully submits that a sentence of no more than 60 months is sufficient, but not greater than necessary, in his case.

I.  SENTENCING FACTORS UNDER 18 USC § 3553(a)

A.  History and Characteristics of the Defendant

Soloman is 24 years old. His father, Zaid Yousif Alkadhi, is a chemical engineer, who immigrated from Iraq and settled in the Raleigh, North Carolina, area. His mother, Witney Lynn Moores is a special education teacher who resides in Plantation, Florida. At the time of their marriage, Zaid had two children Yousif Alkadhi, who is now a practicing physician in the Raleigh area, and Ibrahim Alkadhi, who is now auto mechanic in the Raleigh area. During their marriage, Witney and Zaid had two children, Soloman and Sarah Alkadhi. Soloman's parents divorced when Soloman was approximately 7 years old. Thereafter, Soloman's parents shared joint custody of their two common children.

Solomon attended School in Florida and North Carolina, ultimately graduating from high school in Florida. After high school, he attended a semester each at two separate colleges in South Florida. Although the divorce was amicable, both Solomon and his sister had social difficulties in their teens demonstrating difficulty adjusting to the new family situation.[1] Solomon's sister Sarah during high school engaged in a relationship with a male class mate resulting in teen pregnancy. See Yousif Alkhadi's letter attached as enclosure 1. As set out further below, Soloman also formed an intense relationship with a female student. During the relationship, Soloman became much more religiously conservative in his views than his family. See also letters of Yousif Alkhadi, Enclosure 1 and Zaid Alkhadi, Enclosure 2.

---

[1] During his probation interview, Soloman indicated that he did not experience difficulty in high school and was not traumatized by the divorce. The objective facts, however, do support difficulty in adjusting.

2

After his first year in college, he traveled to Kenya in October of 2009 for approximately twenty days, giving rise to the present charge. After returning from Kenya, Solomon moved back in with his father and completed, approximately a year of technical training in the medical field at a community college in North Carolina. Following his return to North Carolina, Soloman also worked in the medical field as a nursing aid. During this period, Soloman gradually rejected the conservative teachings and associated extremist views he had previously held to the point of complete abdication.

B. The Events Giving Rise to the Offense Conduct

Prior to beginning his senior year in high school the defendant moved from his father's home in North Carolina to live with his mother in Cooper City, Florida and began a romantic friendship with a fellow female student. The female student was from a conservative Muslim family and strongly devout in her religious beliefs. During his relationship with her, Soloman developed much stronger religious beliefs of his own. While searching for greater understanding of Islam, Soloman came upon the recorded sermons of Anwar al-Awlaki. Anwar Al-Awlaki's sermons initially had a profound effect on Soloman, demonstrated both by his dress and personal habits, and an intensifying interest in civil unrest in the Muslim world and the efforts of groups to establish religious states.

After high school the young lady and Soloman attended different colleges. The relationship with the young lady ended toward the conclusion of their freshman year after her family expressed their disapproval of the relationship and their intent for her to marry a different young man. Following the end of the relationship, Soloman intensified his internet activity and, in particular, research about Somalia and al-Shabaab. In the fall of his sophomore year, on October 9, 2009, Soloman travelled to Kenya utilizing money he had saved. Prior to leaving for Kenya, he informed no one, including his family, where he was going. After arriving in Kenya, Soloman travelled to the Somalia border, where he was stop by the Kenyan police. In his interrogation by the Kenyan police, Soloman admitted that he intended to travel into Somalia. Following a brief detention, the Kenyan Government expelled Soloman from Kenya back to the United States.

In Soloman's absence his parents contacted the US authorities, including the FBI, about their son's disappearance. During the FBI's investigation Soloman's mother gave the FBI authority to search Soloman's room, at which time his laptop with confiscated. A subsequent

3

search of his laptop revealed Soloman's internet browsing history. Prior to completing the search of Soloman's computer, Soloman was detained and question by FBI agents in Chicago, IL, upon his return to the United States. Soloman denied having researched Somalia, al-Shab, or his intentions to travel to Somalia. Soloman later admitted that the statement he made in Chicago was untrue.

### C. The Guidelines Sentencing Range

Probation has determined, and Soloman agrees, that the total offense level for his offense is 23, including a downward adjustment for acceptance of responsibility, and an anticipated motion by the government under § 3El.l(b), for an additional 1 level decrease, based on his guilty plea immediately following arraignment. Soloman has no criminal history, and agrees with Probation that his criminal history of category is 0. The offense level combined with his criminal history results in a guideline imprisonment range of 46 to 57 months.

### D. The Need to Avoid Unwarranted Sentence Disparities.

A sentence of 60 months would not create unwarranted sentencing disparities either generally or specifically. Mr. Alkhadi's is the sole person charged in the indictment and a sentence of 60 months will not result in a disparity between him and any other person implicated by his conduct. The agreed sentence recommendation is above the guidelines range. The agreement was part of a negotiated plea agreement wherein Soloman agreed to the above guidelines recommendation in consideration for the government agreeing to charge the lesser offense of 18 U.S.C. § 1001(a)(2) (making a false, fictitious and fraudulent statement involving international terrorism), as opposed to 18 U.S. Code § 2339B (material support of a foreign terrorist organization). Material to the agreement was Soloman's subsequent conduct following his return to the United States from Kenya wherein he demonstrated a complete renunciation of his former conduct. Under the circumstances Mr. Alkhadi acknowledges that a sentence of up to 60 months does not result in an unwarranted sentence disparity compared to other similarly situated defendants, in part because counsel is unaware of any similarly situated defendants.

### II. PURPOSES UNDER 18 USC § 3553(a)(2)

Under 18 USC § 3553, the court is instructed that it "shall impose a sentence sufficient, but not greater than necessary".

4

A. <u>Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense.</u>

The offense of false statement in conjunction with the terrorism investigation, as evidenced by the guidelines treatment, which significantly enhances the punishment for a false statement that inhibits a terrorism investigation, is undoubtedly serious. Guidelines range for the offense is assumed to be reasonable. See *Gall v. United States*, 552 U.S. 38 (U.S. 2007) ("If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness." Gall at 51). The agreed on upward variance recognizes that the conduct charged includes the potential for a more significant offense, while also recognizing the circumstances of the offense, including Soloman's youth and subsequent rejection of the ideology that led him to commit the offense.

B. <u>The Resultant Sentence Constitutes Adequate and Appropriate Deterrence.</u>

As evidenced by Soloman's father's letter, attached as Enclosure 2, Soloman's conduct following the almost 5 years since his travel to Kenya and subsequently interviewed by the FBI demonstrates that deterrence does not require confinement to ensure Soloman's rehabilitation. Soloman's rehabilitation is further illustrated by the fact that following his plea he voluntarily met with the Government to provide information regarding the circumstances that led to his attempted travel to Somalia. Although, the information he provided may not constitute substantial assistance under §5K1.1 of the Sentencing Guidelines, it is further evidence of Soloman's rejection of the ideology that led to his offense and his desire to prevent others from falling victim to the same influences.

The joint sentence recommendation instead reflects the need for general deterrence. General deterrence is served by the recommended sentence. Although the sentence is less than others have received for attempted travel to Somalia with the intent to join al-Shabaab, it is appropriate for the offense for which Soloman pled guilty. Further it stands as an example to both young Muslims and their families to not only deter conduct, but also to encourage cooperation with the government at the first sign that something might be amiss.

### C. The Need for Care, Treatment or Training of Defendant

This concern is marginally implicated in Soloman's case. Following his offense conduct, Soloman has used alcohol and marijuana during the past year. His substance abuse of marijuana, however, is not untypical for a person of his age and is best addressed as part of a mandatory treatment program during probation rather than by additional incarceration. Nor will a sentence of greater than 60 months result in additional training opportunities for Soloman. Following his return from Kenya, Soloman pursued certification and worked as a medical aid. Soloman and his family have expressed an interest in Soloman completing his college education. His desire demonstrates a commitment to living a productive life. While confinement does not prohibit him from reaching this goal, a sentence of over 60 months does not promote it, either.

## III. THE DEFENDANT'S SENTENCING RECOMMENDATION

### A. A Term 60 Months Confinement

Pursuant to his plea agreement recommends and for the reasons set forth above the defendant recommends that the court award a sentence of 60 months confinement.

### B. No Fine Should Be Imposed

The defendant respectfully concurs with Probation that under the factors set out in §3572, a fine is not appropriate in his case. The Factors under § 3572(a) on whether to impose a fine and the magnitude include the defendant's income, earning capacity, and financial resources; the burden that the fine will impose on the defendant or any dependents; any loss to victims of the offense; whether restitution has been ordered; the need to deprive the defendant of illegally obtained gains; and the costs to the government of incarceration. 18 U.S.C. § 3572(a). In Soloman's case, he has minimal assets and no income with which to pay a fine. There was no financial loss or gain attributable to his criminal conduct, mooting factors associated with financial loss or gain. Although the government will incur incarceration costs with Solomon's sentence, this factor alone is insufficient alone to warrant a fine.

DATED this 3rd day of July, 2014

Respectfully submitted,

*/s/ Charles D. Swift*
Charles D. Swift (WSBA# 41671)
cswift@prolegaldefense.com
Swift & McDonald, P.S.
1809 7th Avenue, Suite 1108
Seattle, WA 98101
Telephone: (206)441-3377
Facsimile: (206)224-9908
Attorney for Defendant Soloman Alkadhi, PRO-HAC

Certificate of Service

I hereby certify that a true and correct copy of the foregoing was served by email on July 3, 2014 on all counsel or parties of record on the Service List below.

*/s/ Charles D. Swift*
Charles D. Swift

Adam S. Fels
Adam.Fels@usdoj.gov
United States Attorney's Office
Southern District of Florida
99 N.E. Fourth Street, Ste 800
Telephone: (305)961-9325
Facsimile: (305)536-4675
Attorney for United States of America

Enclosure 1

July 2014

Dear Honorable Federal Court Judge,

My name is Yousif Alkadhi. I am an emergency physician in North Carolina, and Soloman Alkadhi's eldest brother. Although I may be biased in my perspective, I would like to share my personal insights into the events leading to him being before you, as well as the life he has lived since those unfortunate events.

About 6 years ago, Soloman went to live with his mother and stepfather in South Florida. Although his relationship and male role models were all in North Carolina, and he asked to return home to, our father encouraged him to stay in Florida where his college tuition would be subsidized.

While in Florida Soloman would call me every few weeks, however I always seemed busy when he called (I was a medical student / resident at the time). In retrospect, I didn't give him the time he needed or deserved. Just prior to his going overseas, his sister (whom he often directly cares for) became pregnant out of wedlock via a boy neither of her parents approved. Additionally, he didn't get along with his stepfather in Florida and had recently been rejected by his first real love interest.

My brother was depressed and his family support system failed him. Without his brothers or his father locally to turn to, he became influenced by hyper-religious ideals and found what he thought was refuge. When all of his outside stressors were about to climax (including his sister giving birth), he simply ran away. I cannot stress this enough. He did not conspire or perform any terrorist acts; he didn't provide or attempt to provide material support to any terrorist organizations. He simply ran away, going to where he thought he could find the closest thing to an Islamic state.

When I was informed that Soloman and his passport were missing, and we had nearly eliminated any local friends or family that he could be with, I immediately called the FBI office in North Carolina and asked them to help us look for him. As an emergency physician, in times of crisis, we always hope for the best, but plan for the worst. Soloman had never verbalized to me or given any hint of violence towards any person or political cause at all. But as a worst case contingency, knowing that he had become somewhat more religious (reflected in his clothes, facial hair, and diet), I feared for the worst.

Soloman in the meantime thankfully was stopped at the Somali border and sent to a jail in Kenya. His first phone call was to his father (a voicemail I still have saved and would love to share with you). In it you can hear the naivety in his voice, calmly telling us that he's "currently in jail in Kenya,", asking us to contact the US embassy, and then saying, "everything is going good" before telling us he loved us and goodbye.

Even when he returned, I don't think it dawned on him just how stupid, reckless and life changing his actions were. In fact he was taken aback when he realized he was placed on the no-fly list. Thankfully, the last 5 years have accelerated his maturity beyond belief, and he has grown and developed into a young man that I am proud of.

In the time since his return, he has become a Certified Nursing Assistant and worked in our local hospital taking care of critically ill patients, paying taxes and contributing in a meaningful way towards society. He has saved a majority of his earnings, and has paid for his lawyer himself, saving the taxpayers the burden of a public defender and his family the weight of a costly defense. Even more meaningful is the impact he's had on us. Our grandmother, the matriarch of our large family, was recently diagnosed with

ovarian cancer and needed at one point nearly round the clock in home care. Soloman was the most reliable family member, always dropping everything to be at her side, comforting and reassuring her, nursing her to good health.

Our sister Sarah fortunately has a somewhat better relationship with her parents at this time, however remains nearly estranged from her father, and is hundreds of miles away from her mother. She would not be where she is today, gainfully employed, also as a nursing assistant, had it not been for Soloman working tirelessly as an intermediary between her and her parents, helping her overcome everything from homelessness to the daily challenges of early adulthood and single parenthood.

As you consider my brother's sentence, I plead for the court's mercy and leniency in considering his term. The crime he is pleading guilty to, from my perspective, amounts to not exercising his 5th Amendment right, and in its stead, falsely claiming ignorance instead of admitting that he had done research and was aware of the political and security climate in Somalia. I do not believe that he was traveling to provide any specific or general assistance to any designated foreign terrorist organization, despite the language included in his proffer. Despite the semantics, he knows he committed a crime, and is deeply regretful. No one was harmed by his actions more than he was. I beseech that you bless him with the lowest penalty you see fit.

As an aside, I learned from reading the plea agreement that his penalty can also include a monetary fine of up to $250,000. I asked his attorneys if it would be possible, in lieu of maximum jail time, for me to pay off the monetary fine by working shifts in the local Army or VA hospitals here that are actively in need of physicians and overcrowded in their emergency departments. While I was turned down, I know Soloman would likewise much rather actively contribute via a work release program of some sort, than as an incarcerated burden on the taxpayers.

Finally, whatever the final outcome here today, I would like to apologize on my and our family's behalf. This entire ordeal has become a burden on this court and our country – a seeming waste of important resources from multiple departments, which may have been avoided had we been there to give my brother more support and oversight during his time of need. I appreciate your service, valuable time and thorough attention.


With sincerest gratitude,


*[signature]* M.D.


Yousif Alkadhi, MD

Enclosure 2

To: The Honorable Judge

From: Zaid Alkadhi

Date: June 8, 2014

Subject: Soloman Alkadhi Sentencing

Several months before Soloman travelled to Africa, he called me from Florida and asked if he could move back and live with me. At the time he was living with his mother and stepfather and attending college. I did not fully appreciate Soloman's situation and brushed his request aside telling him he should stay with his mom in Florida and finish school since his college tuition was prepaid. This advice was a mistake on my part as I should have realized that Soloman doesn't complain about anyone and that his request was actually a sign that he was in distress. I later learned that Soloman had recently had a failed love affair and that the girl's parents had discouraged the relationship.

Few weeks later I learned from his mother that Soloman had moved out of her house. This was a shock and no one knew where he was. After a few days of frantic searching, I contacted the FBI to try and find him. It was a relief to get a voice mail from Soloman asking me to call the US Embassy in Kenya to help him out.

I honestly believe that Soloman was young, heartbroken, under stress and psychological strain, and susceptible to unsuitable influences that contributed to his behavior and poor decisions as way to try and get out of his situation.

After returning from Africa, Soloman lived with me in a nurturing environment surrounded by loving family. In addition he has returned to school receiving Certified Nursing Assistant (CNA) certificate and also worked towards Emergency Medical Services (EMS). He passed all of his EMS classes and the written part of the exam, but did not pass the practical part in the field. This was a surprise to his adviser, but it turned out that Soloman froze in the field when facing real patients and was afraid that he would do something wrong that would have a negative impact on the patients. After I found this out, I explained to Soloman that his instructors on the practical portion would not let him do anything to inadvertently injure the patient and would intervene if necessary. I actually think that Soloman would not have any problem passing the EMS practical part now.

For the last several years Soloman has been working as a CNA at Wake Medical Center in Raleigh, NC and has been paying taxes.

He is the intermediary between me and my estranged daughter (Soloman's sister who had a baby girl out of wedlock). He helps his sister and her daughter in various ways such as transportation, car repairs, budgeting, helping with expenses, etc.

Soloman has also been helping take care of his grandmother through her ordeal with cancer – chemotherapy and surgical recovery.

Since Soloman's return from Africa (over 5 years ago) and while living with family, I have been proud of my son both in his behavior and decisions. In my opinion he appears to be a normal, well-rounded young man. When he was in school and at work, he took few trips with classmates and workmates of various backgrounds and faiths. Five years ago, Soloman made a mistake. There is no denying it and he has stepped forward to take responsibility for his actions. I feel that there were mitigating circumstances that may have contributed to his poor choices, but I will always be haunted by hind-sight that I did not respond correctly to his cry for help and contributed to the problem. I don't feel that the Soloman of today is the Soloman of 5 years ago – he is much more mature and responsible and essentially, has grown up. Soloman has been in school and/or working (plus paying taxes) for the last 4.5 years and I sincerely doubt that the FBI would have allowed him to be unsupervised and loose if he was a threat. I plead with the court to award the lowest possible sentence. I also ask the Court to recommend that his confinement be served at a location that permits his mother siblings and me to visit him regularly, as I am convinced that our influence is critical to his continued rehabilitation. Finally, I hope that whatever the sentence, Soloman will have the opportunity to get a college degree where he can learn the skills to be a benefit to society.

Thank you,

*[signature]*

Zaid Alkadhi (Soloman Alkadhi's father)